UNITED STATES of America, Plaintiff,

v.

ONE PARCEL OF REAL ESTATE AT 5745 N.W. 110 STREET, MIAMI, FLORIDA, together with all appurtenances thereto and all improvements thereon, Defendant.

No. 89–0077–CIV.

United States District Court, S.D. Florida.

Aug. 18, 1989.

· Lynn Summer, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Jerrard B. Cutrone, Miami, Fla., for defendant.

MEMORANDUM ORDER

SCOTT, District Judge.

Pursuant to Title 21, United States Code, Section 881(a)(7), Plaintiff, United States of America, seeks forfeiture of a single family residence located at 5745 N.W. 110 Street, Miami, Florida.[1] The Claimant, Abigail Roque ("Mrs. Roque"), is an owner of the property.[2] The Government alleges that the Defendant real property was used to facilitate the commission of Title 21 violations in that on October 21, 1988, a quantity of marijuana and narcotics paraphernalia were found on the premises. Mrs. Roque does not contest that narcotics were found on the premises, but Claimant maintains that she was an innocent owner. With the issues joined, this case proceeded to trial. The Court enters these findings and conclusions.[3]

I.

1. On October 24, 1988, federal agents apprehended a fugitive Lino Sanchez, a/k/a Hector Calero or Andreas Gomez. Sanchez was wanted for narcotics violations.

2. Special Agents of the Federal Bureau of Investigation, prior to effectuating the arrest, observed Sanchez enter the Defendant premises. The Federal Bureau of Investigation advised Drug Enforcement Administration Special Agent Larry Loveless of their observations concerning Sanchez and his entry into the premises.

3. On October 24, 1988, Agent Loveless and other agents proceeded to 5745 N.W. 110 Street. Their purpose was to interview the occupants and follow-up the investiga-

---

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1355 and 2461.

2. Orlando Roque withdrew his claim on the morning of trial, following his criminal convic-

tion on related narcotics charges. 21 U.S.C. §§ 841(a)(1) and 846.

3. Federal Rule of Civil Procedure 52(a).

tion. Agent Loveless, accompanied by Agent Stephen Hayward, proceeded to the front door, while other federal agents and uniformed Metro police officers surveyed the house.

4. Loveless knocked and Abigail Roque answered. Mrs. Roque advised the agents that she lived at the premises with her husband, children and mother. At that time, her husband was not at home but her children and mother were.

5. Loveless, who speaks fluent Spanish based upon education and prior experience with the United States Border Patrol, explained to Mrs. Roque that he was investigating Sanchez. He showed Mrs. Roque a picture of Sanchez. She denied ever having seen Sanchez or that he had been at the premises that day.[4]

6. Agent Loveless asked Mrs. Roque for permission to search the house. He explained that she had the right to refuse. Mrs. Roque agreed to the search of the house [5] under the condition that only two agents would be permitted to conduct the search. Agents Loveless and Hayward agreed to the condition and entered the house.

7. Upon entering, the agents inquired if any weapons were present. Mrs. Roque responded affirmatively and led them to the master bedroom where handguns and a rifle were located. After disabling the weapons, the agents proceeded to search the home.

8. In chronological succession, the following narcotics and drug paraphernalia were discovered:

a. *Garage.* The garage was searched first. The agents found a large scale, two blue suitcases filled with marijuana,[6] a locked closet door [7] in which more marijuana was located and two cans of acetone, a chemical often used for processing cocaine. At this point, back-up units were notified, and they proceeded to the Roques' residence to assist in a further search of the premises.

b. *Bathroom.* In the bathroom located on the east side of the residence, agents discovered a triple beam scale, Inositol powder and more marijuana. Agent Loveless testified that the items located in the bathroom were consistent with drug trafficking.

c. *Master Bedroom.* In a dresser drawer in a wall unit of the master bedroom, the agents discovered a zip-lock bag containing marijuana. At trial, there was a dispute between the parties as to whether the marijuana was surrounded by women's or men's apparel. Regardless of the type of apparel, the dresser containing the marijuana was located in the master bedroom shared by Orlando and Abigail Roque.

d. *Office.* Located behind the Roques' residence is a structure which was used by both of the Roques as an office. While Mrs. Roque was unemployed at the time of trial, she apparently attended school and had some prior involvement in the travel business. In the office, agents located records and price sheets indicating narcotics transactions.

e. *Van.* A late model van owned by Mrs. Roque was in the driveway of the Defendant property. Government agents testified that they found a partially burned marijuana cigarette in the vehicle's ashtray. The residue was tested and determined to be cannabis. At trial, Mrs. Roque testified that the van belonged to her, but she categorically denied that there was marijuana in the van.

9. Drug Enforcement Administration Special Agent Nelson Gonzalez testified that on March 24, 1989, he arrested Orlando Roque at a service station. Mr. Roque was standing near a box with ten kilo-

---

**4.** At trial, Mrs. Roque admitted that she knew Sanchez, but was afraid to admit it to the agents.

**5.** At trial, Mrs. Roque testified that she never sought her husband's advice because he could not be reached at work.

**6.** As Agent Loveless reached for the suitcase, Mrs. Roque stated that the suitcase was not hers. When asked who owned the suitcase, Mrs. Roque said she did not know.

**7.** Mrs. Roque produced a key to the locked closet, but it did not work.

grams of cocaine. He was charged with Title 21 violations. After one hung jury, Mr. Roque was subsequently convicted. Gonzalez also testified that the records found in the office of the Defendant property were consistent with a narcotics transaction.

10. Abigail Roque was the sole witness on behalf of her claim. Mrs. Roque, age 29, testified that she has known her husband for twelve or thirteen years. She has a ninth grade education, has attended vocational schools and has worked at various jobs. She denied any prior arrests, convictions or involvements in drug transactions. Mrs. Roque testified that while she lived with Orlando for several years, she did not marry him until September 15, 1984 or 1985. She could not recall the year. She doesn't remember the purchase date of the residence, but at that time, she was not legally married to him. The two children are ages 9 and 3.

Mrs. Roque testified that approximately one to two months prior to the October search, her husband's brother Efrain arrived from Texas.[8] The reason for his move to Miami may have been illness, as Efrain was subsequently hospitalized for a tumor. Efrain stayed at the Roque residence, possessed keys and had complete access to the premises. Mrs. Roque testified that Sanchez was a friend of her brother-in-law. She also admitted for the first time that Sanchez may have been in the home.

At trial, Mrs. Roque admitted that marijuana was used in the home. Apparently, the marijuana was used by Efrain. Mrs. Roque denied any knowledge of narcotics transactions in the house. She claims that she did not know that marijuana was located in the house. In short, she claims to be an innocent owner.

8. Mrs. Roque stated that she had visited a ranch in Texas, in 1984 or 1985, and that Efrain either owned the ranch or lived there. The Court's recollection is that Sanchez may have also either lived at the ranch or owned it. Obviously, there is an inference that the ranch may have been a base for illegal narcotics operations.

## II.

While various issues were discussed at the time of trial, the major factual contention is whether Abigail Roque knew that the Defendant residence was being used to facilitate the commission of Title 21 violations. If Mrs. Roque knew about the transactions, then the residence is forfeitable to the Government, as Orlando Roque has already withdrawn his claim.[9] If she did not possess actual knowledge, the Government argues that the residence is still forfeitable under the so-called *Calero–Toledo* doctrine [10] since Mrs. Roque failed to affirmatively demonstrate that she did all that could reasonably be expected to prevent the illegal use of the real property. The Government points to the recent decision by the Eleventh Circuit in *United States v. One 1980 Bertram 58 Foot Motor Yacht*, 876 F.2d 884 (11th Cir.1989) as authority for its position. Claimant counters that the *"Calero–Toledo"* doctrine should not be extended to forfeitures of home residences under Section 881(a)(7). Claimant argues that forfeitures are not favored in the law, and, in particular, the home should be afforded greater protection than a conveyance or a boat, citing *United States v. Certain Lots in Virginia Beach*, 657 F.Supp. 1062 (E.D.Va.1987).

## III.

With the contentions outlined, the Court returns to the threshold question: Did Abigail Roque know that the Defendant residence was being used to facilitate the commission of illegal drug transactions? *See United States v. A Single Family Residence*, 803 F.2d 625 (11th Cir. 1986). The Court is compelled to answer that question in the affirmative. To hold otherwise would be to defy logic, common sense and the moral force of the evidence. The record demonstrates the following:

9. The evidence demonstrated that Orlando and Abigail Roque owned the premises as joint tenants.

10. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

1. Marijuana was found in no less than three different areas of the residence: the garage, the bathroom and the master bedroom.

2. Drug paraphernalia, including scales, chemicals and powder were found in two locations: the garage and the bedroom.

3. Drug transaction records were found in the office.

4. Marijuana was located in Mrs. Roque's van.

5. Mrs. Roque admitted that marijuana had been smoked in the house.

6. Her husband was subsequently convicted on a ten kilogram transaction.

7. Sanchez, a known drug trafficker, was an associate of Efrain, the brother-in-law and, in fact, had been at the Defendant residence on the day of the arrest.

8. The marijuana and other drug instruments may have been in the home for a period of one to two months prior to October 21, 1988.

These circumstances, in combination with the entire record, lead the Court to the inescapable conclusion that Abigail Roque knew that the home was being used to violate Title 21. Indeed, the evidence is sufficient to support a finding that Mrs. Roque had constructive possession of the drugs and paraphernalia. *See United States v. Poole*, 878 F.2d 1389 (11th Cir. 1989); *United States v. Morales*, 868 F.2d 1562, 1573 (11th Cir.1989). Alternatively, and at the very minimum, the Court concludes that Mrs. Roque deliberately closed her eyes to what she had every reason to believe was the truth. Under those circumstances, her deliberate avoidance of positive knowledge is the equivalent of knowledge. *See United States v. Aleman*, 728 F.2d 492 (11th Cir.1984); *United States v. Batencort*, 592 F.2d 916 (5th Cir.1979); *United States v. Restrepo–Granda*, 575 F.2d 524 (5th Cir.1978). Under either scenario, the Court must find against the Claimant.[11] Notwithstanding the sympathy naturally invoked by Mrs. Roque's plea and this Court's natural sentiment to allow her to retain her family abode, there is no factual or legal support for her position.

### IV.

Accordingly, it is ordered and adjudged as follows:

1. The claim of Orlando Roque is dismissed.

2. The claim of Abigail Roque is rejected. The Court finds that the Claimant has failed to prove the defense of an innocent owner.

3. The Government shall forthwith submit a judgment consistent with these findings.

DONE and ORDERED.

---

**11.** In light of our disposition of the case, the Court need not address the applicability of *United States v. One 1980 Bertram 58 Foot Motor Yacht*, 876 F.2d 884 (11th Cir.1989). We leave that question for another day.